## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **ex rel., Frank F. Kromenaker,** ) | |
| ) | |
| **Relator,** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO.** |
| ) | **1:15-CV-4413-SCJ** |
| **KIMBERLY CLARK CORP.,** ) | |
| **HALYARD HEALTH, INC.,** ) | |
| ) | |
| ) | |
| )**(TRIAL BY JURY DEMANDED)** | |
| ) | |
| **Defendant.** ) | |
| ) | |

## RELATOR'S SECOND AMENDED QUI TAM COMPLAINT

COME NOW Frank F. Kromenaker, Relator, by and through undersigned counsel, before this Honorable Court on behalf of himself and the United States of America, its departments and agencies, and bring this Amended Complaint against Defendants Kimberly Clark Corporation and Halyard Health, Inc., for money damages and civil penalties arising out of Defendant's violations of the False Claims Act, 31 U.S.C. § 3729, which violations are described hereinafter with particularity. The Relator re-alleges all prior paragraphs in the original Complaint as if set out here in full.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over the Relator's claims brought under the False Claims Act, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732.

2.      This Court has personal jurisdiction over Kimberly-Clark Corporation and Halyard Health, Inc. pursuant to 31 U.S.C. §3732(a) because Kimberly-Clark Corporation and Halyard Health, Inc., transact business in and are found in this District.

3.      Venue is proper pursuant to 31 U.S.C. §3732(a) and under 28 U.S.C.§§ 1391(b) and 1395(a), because Kimberly Clark Corporation and Halyard Health, Inc. transact business within this District.

## PARTIES

4.      Relator Frank F. Kromenaker is a United States citizen and resident of Wisconsin who was employed by Kimberly Clark Corporation from approximately January 30, 1989 through November 2, 2011.

5.      Defendant Kimberly-Clark Corporation (hereinafter "Kimberly-Clark") is a corporation organized pursuant to the laws of the State of Delaware with its principal place of business in Irving, Texas.

6.      Defendant Halyard Health, Inc., (hereinafter "Halyard" or "Halyard Health") is a corporation organized pursuant to the laws of the State

of Delaware with its principal place of business in Alpharetta, Georgia.

## BACKGROUND

### Kimberly Clark,  Halyard Health & Frank Kromenaker

7.      As more fully alleged herein, this action arises out of a scheme or schemes to defraud the United States of America perpetrated by defendants Kimberly Clark and Halyard commencing in on or before January 2009 continuing to the date hereof.  The Defendants made and/or caused to bead to the United States false claims for payment for medical devices covered by the Department of Veterans Affairs, Medicare, the public health service and other federal purchasers of medical devices.  The claims were false and fraudulent because the medical devices, which were manufactured at Defendants' plants in various locations and released into the domestic and commercial market laces by Kimberly Clark were defective, not manufactured in accordance with Food and Drug Administration ("FDA") approved processes, and/or did not come with the assurance of identity, strength, quality and purity required for distribution to patients; and/or approvals of the devices were obtained through false representations in regulatory submissions to the FDA.  The false claims arose out of chronic, serious deficiencies in the Quality Assurance functions at Defendants' plants and the Defendants' ongoing serious violations of the laws and regulations designed to ensure the fitness of medical devices for use,

including the federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 et seq.,
and the Code of Federal Regulations, Title 21.

8.     The medical devices affected by the defendants' conduct include
feeding tubes and accessories/attachments; endotracheal tubes
accessories/attachments; feminine care products (i.e. tampons); and surgical
gowns.

9.     Examples of defective, misbranded and/or adulterated medical
device products that Kimberly Clark released or caused to be released in the
United States are:

10.     These acts constitute violations of the federal False Claims Act,
31 U.S.C. § 3729, et. seq., ("FCA").  The FCA provides, inter alia, that any
person who knowingly presents and/or causes to be presented to the United
States a false or fraudulent claim for payment is liable for a civil penalty of
up to $11,000 for each claim, plus three times the amount of the damages
sustained by the government.  The FCA allows any person discovering a fraud
perpetrated against the government to bring an action for himself and for the
government and to share in any recovery.

11.     Kimberly-Clark is a 144-year old multinational corporation that
includes 244 subsidiary companies. Kimberly-Clark is headquartered in
Dallas, Texas and manufactures drugs, preventative medical clothing

including masks, gloves, surgical gowns, and goggles; sterile wrap: medical supplies; medical devices such as endotracheal tubes, feeding tubes, pain management systems, adult and feminine hygiene products; and a variety of other FDA regulated devices.

12.    In November 2013, Kimberly Clark announced the company's plan to pursue a tax-free spin-off of the company's health care business creating a stand-alone, publicly traded health care company. On November 3, 2014 the new company, Halyard Health, debuted as a public company following the spin-off, and began trading on the NYSE under the symbol "HYH."

13.    Halyard Health focuses on seven categories of products: (i) Surgical Solution (products used in operating rooms including gowns, trays, drapes, masks, microbial sealant and sterilization wrap); (ii) Digestive Health (products designed for enteral feeding, diagnostics and endoscopy procedures including feeding tubes, gastric lavage systems, paracentesis needles and trays, endoscopy catheters, cleaning devices and cytology brushes); (iii) Respiratory Health (products designed for airway management and include closed suction catheters, oral care kits, endotracheal tubes and sampling catheters; (iv) Pain Management (products include tools to manage chronic and surgical pain such as needles, trays, radiofrequency generators, cooled RF

treatment systems, incisional pumps, ambulatory pumps and peripheral nerve block pumps); (v) Infection Prevention (products include equipment designed to protect against contamination and infections such as gloves, gowns, masks, apparel, chemotherapy protective equipment and hand hygiene monitoring); (vi) IV Therapy (products include pumps designed for in-home deliver of IV drugs); and (vii) Wound Care products include dressings designed to improve healing and maintain moisture.

14.     Relator Frank F. Kromenaker worked for Kimberly Clark from January 30, 1989 to November 2, 2011 at various Kimberly Clark facilities in Neenah, Wisconsin.

15.     The majority of the Relator's tenure was at Kimberly Clark's Research and Engineering facility, followed by two years at Kimberly Clark's Feminine and Adult Care facility, and two years at Kimberly Clark's FDA Compliance Testing Facility. All of these facilities have a supporting role in designing new or enhancing existing products by either creating or updating the product's manufacturing specifications.

16.     Kimberly Clark and Halyard Health's executive leadership, intentionally, willfully, and purposefully violated FDA regulations and environmental laws for the purpose of lowering their production costs and increasing profits. Kimberly Clark and its subsidiaries have intentionally

provided false and misleading claims as to the safety and efficacy of all the products that Kimberly-Clark and its subsidiary companies manufacture.

## GOVERNMENT PROGRAMS

17.     Medicare is the nation's health program for persons over 65 and/or disabled. Medicare is funded by the federal government. Medical devices related to enteral nutrition therapy ("ENT") (e.g. feeding tubes, tracheal tubes etc.) can be covered under Medicare Part A, Part B or Part C. Medical devices such as surgical gowns are covered under Medicare Part A and Part B. Additionally, durable medical equipment ("DME") is covered under Medicare Part B. Consequently, the federal government is one of the largest end purchasers of ENT related medical devices and DME.

18.     The Department of Veterans Affairs ("VA") provides medical assistance, including the use of medical devices and prescription of said devices, for persons who have been discharged from active duty service in the military, naval or air service.

19.     The Department of Defense ("DOD") administers TRICARE health care program for active duty and retired members of the uniformed services, their families, and survivors. TRICARE benefits includes covered of medical devices.

20.     The Food and Drug Administration ("FDA") is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics, and products that emit radiation.  The FDA administers, inter alia, the federal Food, Drug and Cosmetics Act, ("FDCA"), 21 U.S.C. §§ 301 et. seq;

21.     The FDCA prohibits the introduction or delivery for introduction into U.S. interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded. 21U.S.C. §§ 331(a)-(c).

22.     Consequently, the sale of adulterated and/or misbranded medical devices by Medicare, TRICARE, the DOD, or the VA constitutes, as a matter of law, false and fraudulent statements to the respective federal agencies as well as to the FDA.

23.     Further, payment for medical devices under Medicare, the VA, the DOD and TRICARE is contingent upon FDA approval. See e.g. 48 C.F.R §46.408 and 42 U.S.C. § 1395y(a)( 1).

## ASPECTS OF THE FDA REGULATORY SCHEME RELATING TO MEDICAL DEVICES

24.     Current FDA regulation of medical devices is based on the FDCA as modified by the Medical Device Amendments of 1976 (MDA.  The MDA substantially changed U.S. device regulation, integrating many features

that had previously existed only in drug regulation.

25.    New devices are generally subject to a premarket notification system under section 510(k), requiring a manufacturer or other sponsor to notify the FDA of its intention to market the product.

26.    After this notification, the FDA must affirmatively grant permission for marketing to proceed.  Certain devices that pose a potentially unreasonable risk of patient injury are also subject to a premarket approval process, another established drug regulation device that typically involves clinical trials.

27.    The overall goal of this regulatory scheme is to ensure that a marketed medical device is safe and effective for the indications described on its FDA-approved label.

28.     The FDA regulates medical devices using a classification system based on the risk to the patient from using the devices.  Medical devices are classified into Class I (least risk), Class II, and Class III (most risk).  Regulatory control increases from Class I to Class III.  The device classification regulation defines the regulatory requirements for a general device type.

29.    Most Class I devices are exempt from any clearance or preapproval requirement before they can be sold in the U.S.  Class I devices

can generally be sold without preapproval.

30.    Most Class II devices must receive prior clearance from the FDA before they can be sold in the U.S.  The clearance process is known as "premarket notification" (the manufacturer notifies the FDA of its intention to market the deice) and the application is referred to as a "510(k) application" based on the section of the FDCA which authorizes the process.

31.    Most Class II devices must undergo a more exacting and expensive process, typically requiring clinical trials, known as "premarket approval (PMA) before they can be sold in the U.S.

32.    According to Section 201(h) of the Federal Food Drug & Cosmetic Act, a medical device is defined as: "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including a component part, or accessory which is:

- Recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,

- Intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

- Intended to affect the structure or any function of the body of man or other animals, and which does not achieve any of its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its primary intended purposes."

33.     Any product that meets the above definition of "medical device" is regulated by the FDA and is subject to both pre-marketing and post-marketing regulatory controls.

## GOOD MANUFACTURING PRACTICES

34.     Good Manufacturing Practices ("GMPs") are federal regulations that contain minimum requirements that medical device manufacturing companies must meet in manufacturing, processing, packing, warehousing and distributing medical devices to assure that they meet the safety, identity, strength, quality, and purity characteristics that they purport to possess. Pertinent GMPs are codified in 21 C.F.R. part 820.    Manufacturers demonstrate compliance with GMPs through written documentation of procedures and practices.    The GMPs address issues such as sanitation, process validation, equipment and document traceability, and personnel qualification.

35.     Medical devices are subject to the adulteration provisions of the FD&C Act under Section 501. The first two provisions of Section 501 define adulteration for most cases. A device is held to be adulterated if it includes any filthy, putrid, or decomposed substance, or if it is prepared, packed, or held under unsanitary conditions. The FD&C Act further states that a device is held to be adulterated if:

- Its container is composed, in whole or part, of any poisonous or deleterious substance;
- It contains, for the purposes of coloring only, an unsafe color additive; and
- Its strength differs from, or its purity or quality falls below, that which it claims to represent.

When the Medical Device Amendments were added to the FD&C Act, certain conforming laws, applying specifically to medical devices, were added to Section 501. These provisions relate directly to other portions of the Amendments, granting the FDA authority to control performance standards; compliance with premarket approval applications and product development protocol requirements; banning; good manufacturing practices; and investigational device exemptions. These sections state that a device will also be considered adulterated if:

- It is subject to a performance standard and does not comply with all the requirements of the standard;
- It is a Class III device and fails to conform to the requirements for an approved premarket approval application or a notice of completion of a product development protocol;
- It is a banned device;
- It is in violation of good manufacturing practice requirements; or
- It fails to comply with an Investigational Device Exemption (IDE).

36.    A medical device is misbranded if the device is commercially distributed without FDA concurrence on a Section 510(k) submission. See FDCA §502(o).

## CURRENT GOOD MANUFACTURING PRACTICES

37.    The    current    Good    Manufacturing    Practices    ("cGMP")
requirements were established to allow each manufacturer to decide,
individually, how to best implement the necessary controls required to be in
compliance with applicable GMPs.   The flexibility in the regulations is
designed to promote the use of modern technologies and innovative
approaches to achieve higher quality through continual improvement.
Accordingly, the "cGMP," requires companies to use technologies and
systems that are up-to-date in order to comply with the regulations.

## VALIDATION

38.    Validation is establishing documented evidence that provides a
high degree of assurance that a specific process will consistently produce a
product meeting its pre-determined specifications and quality attributes. See,
"Guidelines on General Principles of Process Validation – FDA (1987)."
Validation is a requirement under the GMP's to be performed prior to the
marketing, sale or release of medical devices into interstate commerce.

## OVERVIEW OF 510(k) PREMARKET AND GMP DEFICIENCIES

39.    Each firm that wants to market a Class I, II, or III medical devices
in the U.S., for which a PMA is not required, must submit a 510(k) to the
FDA, unless the device is exempt from 510(k) requirements of the FDCA  and

does not exceed the limitations of exemptions noted in certain medical device classification regulations.  Because many Class I devices are exempt, and most Class III devices require a PMA, the 510(k) process generally applies to Class II devices.

40.     Title 21 C.F.R. Subpart E describes requirements for a 510(k) submission.  Before marketing a device, each submitter must receive an order, in the form of a letter, from the FDA which finds the device to be substantially equivalent to a lawfully marketed device and states that the device can be marketed in the U.S.  This order "clears" (as opposed to approves) the device for commercial distribution.

41.     Once a device is determined to be substantially equivalent, it can then be marketed in the U.S., but not before.  The substantial equivalence determination is supposed to be made within ninety (90) days from the FDA's acceptance of the 510(k) submission.

42.     Substantial equivalence means that the new device is at least as safe and effective as the predicate.  A device is substantially equivalent to a predicate device if, in comparison,  it has the same intended use and the same technological characteristics as the predicate device;  it has the same intended use and different technological characteristics, but the information submitted in the 510(k) demonstrates that the new device is as safe and effective as the

predicate; and does not raise different questions regarding safety and effectives than the predicate.

43.    From January 2009 to the present, Defendants Kimberly Clark and Halyard failed to make the required 510(k) premarket notifications to the FDA.

44.    Further, from January 2009 to the present, Defendants also failed to list those medical devices where changes to the device's intended use or basic function were made in their annual form FDA-2892 submissions to the Government.

45.    Kimberly Clark and Halyard Health have violated the FDA's GMP regulations and GMP practices, including their own GMP practices.

46.    Nearly all if not all test instruments used by Kimberly Clark and Halyard to test FDA regulated products fail to meet the appropriate and associated FDA regulations. Specifically, Kimberly Clark and Halyard fail to provide adequate validation and/or documentation (refer to 21CFR820.70 3i below) for the overwhelming majority of these test instruments to ensure their accuracy and fitness for use are maintained as specified in FDA regulations. See e.g.  21 C.F.R. §820.70; 21 C.F.R. § 820.72; 21 C.F.R. § 820.75;  and 21 C.F.R. § 820. 25.

47.    As a result of the Defendants' failure to validate, document, calibrate and/or properly maintain testing instruments, the product being manufactured and produced by the Defendants are deemed adulterated and/or misbranded.

## SUMMARY OF FALSE CLAIMS ACT LIABILITY

48.    Defendants have presented false claims resulting in payment by the Government arising both directly and through programs such as the Department of Defense, Department of Veterans Affairs, Medicare and TRICARE.

49.    The false and fraudulent claims by Defendants arise from  the Defendants' has intentional failure to maintain and properly use validation instruments and procedures necessary to test, set up, and maintain proper production lines of FDA regulated products.   As a consequence of the Defendants' failures, various medical devices were and are deemed adulterated or misbranded and thereby, as a matter of law, payments for these medical devices by the federal government were made pursuant to false or fraudulent statements.

50.    The Defendants have failed to follow FDA premarket notification rules regarding the change or modification to devices.  As such the Defendants have presented claims for payment to the federal government

for adulterated or misbranded devices.  Further, as a result, Defendants have committed reverse false claims act violations by failing to pay definite and clear fees that they were obligated to pay.

51.   Defendants have failed have failed to register facilities with the FDA and/or list medical devices bi-annual as required by the FDA. Consequently, the Defendants have committed both factually false certification violations and implied false certifications relating to the False Claims Act.

52.   Defendants have also have committed both factually false certification violations and implied false certifications relating to the False Claims Act with regards to certifications made pursuant to federal government contracts prohibiting the sale of adulterated or misbranded products.

## FACTUAL ALLEGATIONS

53.   From at least January 2009 through the present, Defendants have knowingly engaged in systematic false and fraudulent schemes to defraud the federal programs, Medicare and other agencies of the United States Government out of significant amounts of money.

54.   Defendants have knowingly made, used, or caused to be made or used, false records or statements material to obligations to pay or transmit money or property to the Government in violation of the False Claims Act by

providing false and/or misleading statements in annual registration forms submitted to the federal Government.

55.     Defendants have been knowingly using, making, conspiring, presenting or causing to be presented false statements and claims to the government in violation of the False Claims Act through a variety of improper schemes, including but not limited to falsely or fraudulently, (1) violating the FDA approval process for medical devices vis-à-vis false certifications to the federal Government; (2) violating Good Manufacturing Practices-Quality System Regulations (GMP) by intentionally failing to maintain and properly use validation instruments and procedures necessary to test, set up, and maintain proper production lines of FDA regulated products; (3) violating GMP by setting up a defective quality control system that does not comply with FDA regulations and is designed to hide FDA violations;  (4) selling adulterated and misbranded products to the Government as a result of failing to follow FDA regulations in producing FDA regulated products; (5) selling adulterated and misbranded products to the Government as a result failing to register products and facilities with the FDA to avoid FDA audits; and (6) conspiring with subsidiaries to manufacture adulterated and misbranded products and sale said adulterated and misbranded products to the Government in violation of the FDA regulations and the False Claims Act.

## GOOD MANUFACTURING PRACTICES (GMP) VIOLATIONS

56.     In 1996, Relator Kromenaker began to manage a small team that assisted in designing, fabricating, and documenting the global distribution of unique custom instruments that were used to validate a wide variety of products being manufactured throughout Kimberly-Clark's global manufacturing facilities. By 2011, the number of instruments used to validate Kimberly-Clark's global manufacturing facilities had grown to over 750 instruments.

57.     Relator Kromenaker continued to manage the inventory of custom instruments used to validate and calibrate Kimberly-Clark's manufacturing processes until November 2, 2011.

58.     From 2007 to 2011, Relator Kromenaker's duties shifted from designing custom instruments to primarily overseeing mass production and global distribution of custom instruments in Corporate Quality. More specifically, in approximately March 2010 he was involved with an Integrated Paper Services (IPS) Audit of the Kimberly Clark's validation of  equipment. The Relator was not trained on how to audit using QMART although the Relator was in a position where the outcome of the audit could benefit the Relator.  Not being trained and having a vested interest in the outcome of the audit are violations of FDA GMP regulations.

59.     On multiple occasions, from March 2010 to November 2011, during the aforementioned audit the Relator discovered GMP violations and brought these violations to the attention of his superiors and Human Resources. The Relator even pointed out to Kimberly-Clark's senior leadership that Kimberly-Clark was violating its own Code of Conduct.

60.     In April 2011, the Relator sent a document to Human Resources regarding his job duties and issues discovered during the audit. This document included information that Kimberly Clark was deficient with respect to approximately 700 items in the Custom Equipment Inventory that lacked FDA required documentation.

61.     The Relator continually asked for help, but instead of receiving help in the form of instruction, guidance, resources, or advice on how to rectify this deficit or being concerned with GMP violations, the Relator's manager and Kimberly-Clark's Human Resources retaliated by attempting to intimidate and put pressure on him. This intimidation was demonstrated in a meeting with his manager and Human Resources, where the Human Resources person wrote "Do or Die" on this same document knowing that they were setting up impossible tasks for the Relator.

62.     After the above-referenced meeting, the Relator's senior leadership failed to take adequate action to remedy these situations and

demonstrated a careless disregard of FDA regulations.  In fulfilling his duties, the Relator pushed for compliance with FDA regulations and other laws, but discovered the intentional, willful, purposeful, and unwillingness of Kimberly-Clark's senior leadership to comply with FDA regulations and environmental laws that have a direct impact on government contracts.

### A. Tensile Testing Instruments for Kimberly Clark Feeding Tubes and Endotracheal Tubes are Not Properly Validated, Documented, Calibrated or Maintained

63.     From 2009 through November 2014, Defendant Kimberly Clark used tensile testing equipment to test various products including, but not limited to, feeding tubes and endotracheal tubes manufactured by Kimberly Clark.

64.     Tensile testing is a fundamental material science test in which a sample is subjected to a controlled tension until failure.

65.     Due to the tensile testers' capability, customizing and adaptability, along with the ability to create custom macros, Kimberly Clark uses this equipment to create a custom and unique testing sequence that enables it to test a host of products (e.g. feeding tubes and endotracheal tubes). Although tensile testers are well suited for testing a wide variety of FDA medical products, the tensile testers' software and the custom macro itself need to be validated. See e.g. to 21C.F.R. § 820.70.

66.    On or about March 30, 2010, in Neenah, Wisconsin, Relator Kromenaker discovered that the software of the tensile tester machine used by Kimberly Clark to test feeding tubes and endotracheal tubes and the custom built macros from the machine were not and had never been validated.

67.    On or about March 30, 2010, in Neenah, Wisconsin, Relator Kromenaker in addition to discovering that the tensile tester was not being properly validated, Relator Kromenaker also discovered that the tensile testers were not being properly calibrated; there was no proper documentation addressing how the tensile testers should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the tensile testers that instructed technicians how to validate, inspect or calibrate the tensile testers.

68.    Consequently, on or about March 30, 2010, in Neenah, Wisconsin, the Relator learned that Kimberly Clark was not following or adhering to the FDA's GMP or cGMP.  See e.g.  21 C.F.R. §820.70; 21 C.F.R. § 820.72; 21 C.F.R. § 820.75;  and 21 C.F.R. § 820. 25.

69.    In or about March and April 2010, in Neenah, Wisconsin, Relator Kromenaker notified his supervisor (Stephanie Strzalka) of the GMP and/or cGMP deficiencies above concerning the tensile testers.    However, after notifying his supervisor of the foregoing issues, Kimberly Clark failed to

address the GMP and/or cGMP deficiencies regarding the tensile testers.

70.     As a result, from 2010 through November 2014, Kimberly Clark tensile testers have continually and consistently failed to meet the FDA's GMP regulations to ensure their accuracy and fitness for use in validating FDA regulated medical devices, to wit: feeding tubes and endotracheal tubes.

71.     Because the tensile testers constitute test instruments and/or equipment that were not properly validated, calibrated, documented in regard to how the tensile testers should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the tensile testers that instructed technicians how to validate, inspect or calibrate the tensile testers, from at least 2010 through November 2014, the feeding tubes and endotracheal tubes manufactured and produced by Kimberly Clark were and are adulterated.

72.     Thus, from 2010 to November 2014, Kimberly Clark has manufactured and sold to the federal government feeding tubes and endotracheal tubes that are adulterated.

73.     Further, the foregoing failures in GMP and cGMP regarding the tensile testers cause the adulterated feeding tubes and endotracheal tubes to differ substantially from the documentation provided to the FDA by Kimberly Clark in its premarket notification 510(k) submissions concerning its feeding

tubes and endotracheal tubes.

74.     In other words, it is impossible for the Kimberly Clark feeding tubes and endotracheal tubes to be substantially equivalent to predicate devices given that a vital instrument/piece of equipment used to test these tubes (i.e. the tensile testers) have never been validated to ensure accuracy and fitness.  Therefore, in addition to being adulterated, Kimberly Clark feeding tubes and endotracheal tubes are also misbranded.

75.     From 2010 through November 2014, Kimberly Clark sold feeding tubes and endotracheal tubes directly (e.g. the DOD, or the VA) and/or has been reimbursed by the federal government for the sale of said feeding tubes and endotracheal tubes (e.g. Medicare, TRICARE, etc.).

76.     For example, in the First Quarter of 2014, Defendant Kimberly Clark, pursuant to a federal contract (contract number V7979-4347B), with the Department of Veterans Affairs, in Washington, D.C., presented to the federal government claims for payment totaling $151,994.00 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

77.     In the Second Quarter of 2014, Defendant Kimberly Clark, pursuant to a federal contract (contract number V7979-4347B), with the Department of Veterans Affairs, in Washington, D.C., presented to the federal

government claims for payment totaling $342,636.00 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

78.     In the Third Quarter of 2014, Defendant Kimberly Clark, pursuant to a federal contract (contract number V7979-4347B), with the Department of Veterans Affairs, in Washington, D.C., presented to the federal government claims for payment totaling $271,245.00 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

79.     In the Fourth Quarter of 2014, Defendant Kimberly Clark, pursuant to a federal contract (contract number V7979-4347B), with the Department of Veterans Affairs, in Washington, D.C., presented to the federal government claims for payment totaling $293,946.00 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

80.     The claims presented to the federal government as referenced in the preceding paragraphs were false and fraudulent given that the above-referenced feeding tubes and/or endo tracheal tubes sold to the VA were adulterated and/or misbranded due to Kimberly Clark's failure to follow GMP and/or cGMP as stated above.

81.    In addition, upon information and belief, the Federal Supply Schedule (FSS) related to the foregoing contracts between Kimberly Clark and the VA each contained a routine warranty stating that "All products supplied by Vendor (Kimberly Clark) shall be warranted: I) to be free from defects and imperfections in design, material and workmanship; and II) to be in conformity with all product specifications.  No product shall be adulterated or misbranded."

82.    Further, as will be discussed below, Kimberly Clark also made false and fraudulent statements to the FDA vis-a vis false certifications concerning its feeding tubes and endotracheal tubes.

### B. Kimberly Clark's Syngyna Tester Equipment  Were Not And Are Not Properly  Validated, Documented, Calibrated or Maintained

83.    In approximately August 2011, as part of his job responsibilities, the Relator was sent to perform an on-site quality assurance inspection at the Kimberly Clark Conway, Arkansas manufacturing facility that manufactures feminine care tampons and pads. During his inspection, the Relator discovered numerous FDA regulation deficiencies with the quality testing procedures;   the   instrumentation   used;   ill-trained   employees;   and inappropriate use of instruments, apparatus, and fixturing used to validate the products being manufactured.

84.    From August to October 2011, in Conway, Arkansas, Relator Kromenaker sent multiple e-mail messages to his superiors regarding calibration issues and other deficiencies at the Conway facility including that the dispense pumps used on a key instrument called the Syngyna Tester failed to meet the requirements of 21C.F.R. §801.430.

85.    The Syngyna Tester tests the absorbent capacity of tampons.

86.    In his investigation of the Conway facility between August 2011 and October 2011, Relator Kromenaker discovered that all the Syngyna Testers used throughout Kimberly Clark historically had never met FDA requirements. The Relator communicated his findings vis-à-vis a letter to his superiors and urged change in or about October 2011.    However, long standing safety issues, FDA violations, and lack of proper installation validation placed the Kotex brand name, a billion dollar a year business, in jeopardy.

87.    Relator Kromenaker was instructed to stop communicating about these critical FDA violations and was fired on November 2, 2011. This issue is not limited to Kotex as there are many other well-known brand names that are in this same condition.

88.    In response to Relator's letter, a very limited recall was issued for tampons manufactured at the Conway manufacturing facility on

November 9, 2011. Additionally, Kimberly Clark attempted to further hide this issue by not reporting tampon related issues to the FDA that were manufactured by the Conway, AR manufacturing facility during this period.

89.     About a year later, Kimberly Clark started to report these tampon related issues, which is in violation of the U.S. Code of Federal Regulations 21C.F.R.§803.50 that requires a manufacturer to report adverse issues within 30 calendar days of being notified.

90.     This is further worsened by Kimberly Clark's actions to continually falsify safety information about its products by not reporting incidents with mills not registered with the FDA and disguising injuries as malfunctions in the FDA Maude system.

91.     Relator Kromenaker's investigation concluded that Kimberly Clark should have extended the recall to a much earlier date such as May 11, 2009 when an analysis of the Syngyna tester noted in 21C.F.R.§801.430 showed the test instrument was not properly validated and was not providing valid results and was/is in poor condition.

92.     Further, the Relator's investigation revealed documentation that the validation at the Conway facility was never done correctly and that the recall should have gone back to 1998.  It is clear that Kimberly Clark management had notice of these issues and failed to act on this information.

93.     Further, on May 25, 2010, the Conway facility changed the Kotex Security Tampon specification to increase the absorbent capacity of the tampon.

94.     This significant change to a product should have triggered a new 510K submission to the FDA, but that did not happen.  Consequently, per FDA regulations, the tampons were deemed misbranded and adulterated and the tampons were potentially dangerous to users.

95.     In addition, in an email from Kimberly Clark senior leadership dated August 18, 2011, the senior leader noted bacteria issues with tampons manufactured at Kimberly Clark's Litovel facility in the Czech Republic. The Litovel facility is not registered with the FDA, nonetheless, it exports tampons to Kimberly Clark in the United States.  Despite knowing about the bacterial issues, Kimberly Clark did not recall the contaminated tampons.

96.     More importantly, increasing the absorbent capacity of a tampon violates 21C.F.R.§801.430 and will increase the chance of the user getting Toxic Shock Syndrome (hereinafter, "TSS").  The combination of faulty Syngyna Test instruments that are used in multiple locations and increased tampon absorbency have proven to be a significant source of TSS cases which often require medical attention for the users of these tampons that are manufactured by the Conway facility.

97.     From 2006 to 2015, Kimberly Clark's Tampon Products have had a significantly higher issue rate at 823, than Playtex 59 or Proctor & Gamble at 75.

98.     Defendant Kimberly Clark has concealed from the Government and the public that it has made significant modifications that changed the function of its tampon products without submitting a requisite 510(k).

99.     Further, Kimberly Clark has concealed from the Government and the public that the FDA required Syngyna tester has been functionally incapable of validating tampon products properly, resulting in injuries to product users.

100.    In or about August 2011, in Conway, Arkansas, Relator Kromenaker discovered that the Syngyna Testers used by Kimberly Clark at its facilities worldwide were not and had never been validated.

101.    In or about August 2011, in Conway, Arkansas, Relator Kromenaker in addition to discovering that the Syngyna Tester was not being properly validated, Relator Kromenaker also discovered that the Syngyna Testers were not being properly calibrated; there was no proper documentation addressing how the Syngyna Testers should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the Syngyna Testers that instructed technicians

how to validate, inspect or calibrate the Syngyna Testers.

102.    Consequently, in or about August 2011, in Conway, Arkansas, the Relator learned that Kimberly Clark was not following or adhering to the FDA's GMP or cGMP.  See e.g.  21 C.F.R. §820.70; 21 C.F.R. § 820.72; 21 C.F.R. § 820.75;  and 21 C.F.R. § 820. 25.

103.    In or about October 2011, in Conway, Arkansas, Relator Kromenaker notified his superiors of his findings vis-à-vis a letter to his superiors and urged change   of the GMP and/or cGMP deficiencies above concerning the Syngyna Testers.   However, after notifying his supervisor of the foregoing issues, Kimberly Clark failed to address the GMP and/or cGMP deficiencies regarding the Syngyna Testers.

104.    As a result, from 2010 through the present Kimberly Clark Syngyna Testers have continually and consistently failed to meet the FDA's GMP regulations to ensure the accuracy and fitness for use in validating FDA regulated medical devices, to wit: tampons.

105.    Because the Sygyna Testers constitute test instruments and/or equipment that were not properly validated, calibrated, documented in regard to how the Syngyna Testers should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the Syngyna Testers that instructed technicians how to validate, inspect or

calibrate the Syngyna Testers, from at least 2010 through the present, the tampon products manufactured and produced by Kimberly Clark were and are adulterated and/or misbranded.

106.   Thus, from 2010 to the present, Kimberly Clark has manufactured and sold to the federal government tampons that are adulterated.

107.   Further, the foregoing failures in GMP and cGMP regarding the Syngyna Testers, as well as the change in specifications by Kimberly Clark to increase the absorbent capacity of tampons, cause the adulterated tampons to differ substantially from the documentation provided to the FDA by Kimberly Clark in its premarket notification 510(k) submissions concerning its tampon products.

108.   In other words, it is impossible for the Kimberly Clark manufactured tampons to be substantially equivalent to predicate devices given that a vital instrument/piece of equipment used to test its tampons (i.e. the Syngyna Testers) have never been validated to ensure accuracy and fitness.  Likewise, Kimberly Clark's actions in changing the Kotex Security Tampon to increase the absorbency negated any substantial equivalency tor a predicate device as this action significantly changed or modified the design, components, method of manufacture or intended use of the tampon. Therefore, in addition to being adulterated, Kimberly Clark tampons are also

misbranded.

109.    From 2010 through the present Kimberly Clark has sold tampons to the DOD vis-à-vis its Defense Commissary Agency.

110.    For example, from July 1, 2010 through September 30, 2010, pursuant to a federal contract with the Department of Defense/ Defense Commissary Agency, in Washington, D.C., presented to the federal government claims for payment totaling $16,814,392.73 for the sale of health and beauty supplies (including tampons) to the federal government.  A substantial portion of the foregoing claims for payment, upon information and belief, included payment for tampons sold to the Defense Commissary Agency.  The precise or specific dollar amount of this contract attributable to the sale of tampons and information related thereto is within the exclusive control of Kimberly Clark.

111.    From April 1, 2010 through June 30, 2010, pursuant to a federal contract with the Department of Defense/ Defense Commissary Agency, in Washington, D.C., presented to the federal government claims for payment totaling $16,495, 570.74. for the sale of health and beauty supplies (including tampons) to the federal government.  A substantial portion of the foregoing claims for payment, upon information and belief, included payment for tampons sold to the Defense Commissary Agency.  The precise or specific

dollar amount of this contract attributable to the sale of tampons and information related thereto is within the exclusive control of Kimberly Clark.

112.    From January 1, 2010 through April 31, 2010, pursuant to a federal contract with the Department of Defense/ Defense Commissary Agency, in Washington, D.C., presented to the federal government claims for payment totaling $16,168,850.33 for the sale of health and beauty supplies (including tampons) to the federal government.  A substantial portion of the foregoing claims for payment, upon information and belief, included payment for tampons sold to the Defense Commissary Agency.  The precise or specific dollar amount of this contract attributable to the sale of tampons and information related thereto is within the exclusive control of Kimberly Clark.

113.    From October 1, 2010 through December 31, 2010, pursuant to a federal contract with the Department of Defense/ Defense Commissary Agency, in Washington, D.C., presented to the federal government claims for payment totaling $16,129,620.09 for the sale of health and beauty supplies (including tampons) to the federal government.  A substantial portion of the foregoing claims for payment, upon information and belief, included payment for tampons sold to the Defense Commissary Agency.  The precise or specific dollar amount of this contract attributable to the sale of tampons and information related thereto is within the exclusive control of Kimberly Clark.

114.   From July 1, 2011 through September 30, 2011, pursuant to a federal contract with the Department of Defense/ Defense Commissary Agency, in Washington, D.C., presented to the federal government claims for payment totaling $15,654,849.71. for the sale of health and beauty supplies (including tampons) to the federal government.  A substantial portion of the foregoing claims for payment, upon information and belief, included payment for tampons sold to the Defense Commissary Agency.  The precise or specific dollar amount of this contract attributable to the sale of tampons and information related thereto is within the exclusive control of Kimberly Clark.

115.   From October 1, 2011 through  December 31, 2011, pursuant to a federal contract with the Department of Defense/ Defense Commissary Agency, in Washington, D.C., presented to the federal government claims for payment totaling $16,050,788.39. for the sale of health and beauty supplies (including tampons) to the federal government.  A substantial portion of the foregoing claims for payment, upon information and belief, included payment for tampons sold to the Defense Commissary Agency.  The precise or specific dollar amount of this contract attributable to the sale of tampons and information related thereto is within the exclusive control of Kimberly Clark.

116.   The claims presented to the federal government as referenced in the preceding paragraphs were false and fraudulent given that the above-

referenced tampons that were sold to the Department of Defense/ Defense Commissary Agency were adulterated and/or misbranded due to Kimberly Clark's failure to follow GMP and/or cGMP as stated above.

117.    In addition, upon information and belief, the contracts between Kimberly Clark and the Department of Defense/Defense Commissary Agency each required Kimberly Clark to warrant or certify that the aforementioned health and beauty products (including tampons) sold to the federal government by Kimberly Clark were not adulterated or misbranded.

118.    Further, as will be discussed below, Kimberly Clark also made false and fraudulent statements to the FDA vis-a vis false certifications concerning its tampon products.

## C. Kimberly Clark and Halyard's Automated Blood Strikethrough Tester & GAGE Instrument tester Were Not And Are Not Properly Validated, Documented, Calibrated or Maintained

119.    In approximately March 2010, in Neenah, Wisconsin, Relator Kromenaker was involved with an audit pertaining to Kimberly Clark's validation of equipment.

120.    On multiple occasions, from March 2010 to November 2011, during the aforementioned audit, the Relator discovered GMP violations and brought these violations to the attention of his superiors and Human Resources.

121.    The ABST is an instrument used in barrier testing for products such as surgical gowns to ascertain the amount or level of blood or fluid that can penetrate woven barriers or materials (e.g. surgical gowns).

122.    The GAGE instrument tests the ability of surgical gloves to remain attached to the sleeves of surgical gowns without slipping or sliding down the forearm towards the hand.

123.  In or about March 2010, the Relator found GMP violations relating to the ABST. As early as February of 2006, the Relator found GMP violations relating to the GAGE instruments (GAGE I and GAGE II instruments).

124.    In or about March 2010, in Neenah, Wisconsin, Relator Kromenaker discovered that the ABST used by Kimberly Clark to test surgical gowns was not and had never been properly validated.

125.    In or about February 2006, in Neenah, Wisconsin, Relator Kromenaker discovered that the GAGE I and II instruments used by Kimberly Clark to test non-slip between surgical gowns and surgical gloves were not and had never been properly validated, maintained and/or calibrated.

126.    Further, in or about November 2014 when Halyard replaced Kimberly Clark as the manufacturer of surgical gowns for the two Defendants, Halyard also failed to ensure proper validation, calibration, and/or

maintenance of the ABST instruments / GAGE equipment.

127.   In or about March 2010, in Neenah, Wisconsin, Relator Kromenaker in addition to discovering that the ABST was not being properly validated, Relator Kromenaker also discovered that the ABST was not being properly calibrated; there was no proper documentation addressing how the ABST should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the ABST that instructed technicians how to validate, inspect or calibrate the ABST.

128.   In or about March 2010, in Neenah, Wisconsin, Relator Kromenaker in addition to discovering that the  GAGE I and II instruments were not being properly validated, Relator Kromenaker also discovered that the GAGE I and II instruments were not being properly calibrated; there was no proper documentation addressing how the GAGE I and II instruments should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the GAGE I and II instruments that instructed technicians how to validate, inspect or calibrate the GAGE I and II instruments.

129.   Consequently, in or about March 2010, in Neenah, Wisconsin, the Relator learned that Kimberly Clark was not following or adhering to the FDA's GMP or cGMP.  See e.g.  21 C.F.R. §820.70; 21 C.F.R. § 820.72; 21

C.F.R. § 820.75; and 21 C.F.R. § 820. 25.

130.    From November 2014 through at least the filing of the original Complaint in this action, Halyard continued to use the same ABST instruments/ the GAGE I and II instruments that had been previously used by Kimberly Clark.

131.    From November 2014 through at least the filing of the original Complaint in this action, the ABST and the GAGE I and II instruments were not being properly validated by Halyard; the ABST and the GAGE I and II instruments were not being properly calibrated by Halyard; Halyard has provided no proper documentation addressing how the ABST or the GAGE I and II instruments should be validated, inspected or maintained; and Halyard has provided no written training manuals, procedures or protocols for the ABST or the GAGE I and II instruments that instructed technicians how to validate, inspect or calibrate the ABST or the GAGE I and II instruments.

132.    Consequently, Halyard (in its Georgia facilities) failed to follow or adhere to the FDA's GMP or cGMP. See e.g. 21 C.F.R. §820.70; 21 C.F.R. § 820.72; 21 C.F.R. § 820.75; and 21 C.F.R. § 820. 25 with regarding to the ABST.

133.    As a result of the foregoing, from 2010 through November 2014 Kimberly Clark's ABST and the GAGE I and II instruments

continually and consistently failed to meet the FDA's GMP regulations to ensure the accuracy and fitness for use in validating FDA regulated medical devices, to wit: surgical gowns.

134.    As a result of the foregoing, from 2014 through at least the filing of the original Complaint in this action, Halyard's ABST the GAGE I and II instruments continually and consistently failed to meet the FDA's GMP regulations to ensure the accuracy and fitness for use in validating FDA regulated medical devices, to wit: surgical gowns.

135.    Because the ABST and the GAGE I and II instruments constitute test instruments and/or equipment that were not properly validated, calibrated, documented in regard to how the ABST and the GAGE I and II instruments should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the ABST or the GAGE I and II instruments that instructed technicians how to validate, inspect or calibrate the ABST or the GAGE I and II instruments, from at least 2010 through the present, the surgical gowns manufactured and produced by Kimberly Clark and Halyard were and are adulterated and/or misbranded.

136.    Thus, from 2010 to the present, Kimberly Clark and Halyard have manufactured and sold to the federal government surgical gowns that are adulterated.

137.   Further, the foregoing failures in GMP and cGMP regarding the ABST, cause the adulterated surgical gowns to differ substantially from the documentation provided to the FDA by Kimberly Clark in its premarket notification 510(k) submissions concerning its surgical gowns.

138.   In other words, it is impossible for the Kimberly Clark and Halyard manufactured surgical gowns, respectively, to be substantially equivalent to predicate devices given that a vital instrument/piece of equipment used to test these gowns (i.e. the ABST and the GAGE I and II instruments) have never been validated to ensure accuracy and fitness. Therefore, in addition to being adulterated, Kimberly Clark and Halyard surgical gowns are also misbranded.

139.   From 2010 through the present Kimberly Clark and Halyard have sold surgical gowns to the federal government.

140.   For example, from November 8, 2010 through the present, pursuant to a federal contract (contract number V7979P4347B), with the Department of Veterans Affairs, in Washington, D.C., both Kimberly Clark and Halyard presented to the federal government claims for payment totaling $18,712,200.00 for the sale of surgical equipment (including surgical gowns) to the federal government. The precise or specific dollar amount of this contract attributable to the sale of surgical gowns and information related

thereto is within the exclusive control of Kimberly Clark and Halyard.

**D. Tensile Testing Instruments for Halyard Feeding Tubes and Endotracheal Tubes are Not Properly Validated, Documented, Calibrated or Maintained**

141.   From November 2014 through the present, Defendant Halyard used tensile testing equipment to test various products including, but not limited to, feeding tubes and endotracheal tubes manufactured by Kimberly Clark.

142.   Tensile testing is a fundamental material science test in which a sample is subjected to a controlled tension until failure.

143.   Due to the tensile testers' capability, customizing and adaptability, along with the ability to create custom macros, Halyard uses this equipment to create a custom and unique testing sequence that enables it to test a host of products (e.g. feeding tubes and endotracheal tubes).  Although tensile testers are well suited for testing a wide variety of FDA medical products, the tensile testers' software and the custom macro itself need to be validated. See e.g. to 21C.F.R. § 820.70.

144.   On or about March 30, 2010, in Neenah, Wisconsin, Relator Kromenaker discovered that the software of the tensile tester machine used by Kimberly Clark to test feeding tubes and endotracheal tubes and the custom built macros from the machine were not and had never been validated.

145.   In or about November 2014 when Halyard replaced Kimberly Clark as the manufacturer of feeding tubes and endotracheal tubes for the two Defendants, Halyard also failed to ensure proper validation of the tensile tester equipment.

146.   Consequently, from November 2014 through at least the filing of the original Complaint in this action, Halyard has failed to follow or adhering to the FDA's GMP or cGMP.  See e.g.  21 C.F.R. §820.70; 21 C.F.R. § 820.72; 21 C.F.R. § 820.75;  and 21 C.F.R. § 820. 25.

147.   As a result, November 2014 through the present Halyard tensile testers have continually and consistently failed to meet the FDA's GMP regulations to ensure their accuracy and fitness for use in validating FDA regulated medical devices, to wit: feeding tubes and endotracheal tubes.

148.   Because the tensile testers constitute test instruments and/or equipment that were not properly validated, calibrated, documented in regard to how the tensile testers should be validated, inspected or maintained; and there were no written training manuals, procedures or protocols for the tensile testers that instructed technicians how to validate, inspect or calibrate the tensile testers, from at least 2010 through the present, the feeding tubes and endotracheal tubes manufactured and produced by Halyard were and are adulterated.

149.    Thus, from November 2014 through the present, Halyard has manufactured and sold to the federal government feeding tubes and endotracheal tubes that are adulterated.

150.    Further, the foregoing failures in GMP and cGMP regarding the tensile testers cause the adulterated feeding tubes and endotracheal tubes to differ substantially from the documentation provided to the FDA by Halyard in its premarket notification 510(k) submissions concerning its feeding tubes and endotracheal tubes.

151.    In other words, it is impossible for the Halyard feeding tubes and endotracheal tubes to be substantially equivalent to predicate devices given that a vital instrument/piece of equipment used to test these tubes (i.e. the tensile testers) have never been validated to ensure accuracy and fitness. Therefore, in addition to being adulterated, Halyard feeding tubes and endotracheal tubes are also misbranded.

152.    From November 2014 through the present Halyard has sold feeding tubes and endotracheal tubes directly (e.g. the DOD, or the VA) and/or has been reimbursed by the federal government for the sale of said feeding tubes and endotracheal tubes (e.g. Medicare, TRICARE, etc.).

153.    For example, from July 8, 2015 to July 31, 2015, Defendant Halyard Health, Inc. to a federal contract, with the Department of Defense, in

Washington, D.C., presented to the federal government claims for payment totaling $61,000 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

154.   For example, from September 11, 2015 to September 16, 2015, Defendant Halyard Health, Inc., pursuant to a federal contract, with the Department of Defense, in Washington, D.C., presented to the federal government claims for payment totaling $42,991 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

155.   For example, from June 15, 2015 to June 29, 2015, Defendant Halyard Health, Inc., pursuant to a federal contract, with the Department of Health and Human Services, in Washington, D.C., presented to the federal government claims for payment totaling $148,938 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

156.   For example, from July 24, 2016 to August 9, 2016, Defendant Halyard Health, Inc., pursuant to a federal contract, with the Department of Health and Human Services, in Washington, D.C., presented to the federal government claims for payment totaling $124,066 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

157.   For example, from May 20, 2015 to September 30, 2015, Defendant Halyard Health, Inc., pursuant to a federal contract, with the Department of Veterans Affairs, in Washington, D.C., presented to the federal government claims for payment totaling $143,325 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

158.   For example, from April 8, 2016 to October 31, 2016, Defendant Halyard Health, Inc., pursuant to a federal contract, with the Department of Veterans Affairs, in Washington, D.C., presented to the federal government claims for payment totaling $67,447 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

159.   For example, from November 18, 2016 to December 31, 2016, Defendant Halyard Health, Inc., pursuant to a federal contract, with the Department of Veterans Affairs, in Washington, D.C., presented to the federal government claims for payment totaling $64,667 for the sale of feeding tubes and/or endotracheal tubes (including accessories) to the federal government.

## UNAPPROVED MEDICAL DEVICES

160.   Any product that meets the definition of "medical device" is regulated by the FDA and is subject to both pre-marketing and post-marketing regulatory controls.

161.   Government rules prohibit the Government from paying for medical devices that have not been approved by the FDA.

162.   Manufacturers (both domestic and foreign) and initial distributors (importers) of medical devices and manufacturers of drugs must register their establishments and their devices with the FDA.   All establishment and device registrations must be verified annually in June and December of each year. See 21 C.F.R. §807.

163.   Section 807.22 states that establishment registrations shall be done by the device manufacturer on form FDA-2891 and the initial and subsequent updated listings of medical devices shall be done on form FDA-2892 annually in June and December of each year.

164.   In addition, §807.22(b) specifically states that medical device manufacturers (such as the Defendants) must submit a separate form FDA-2892 for each medical device where changes to the device's intended use or basic function were made (e.g. devices for which 510(k) notifications should have been submitted to the FDA must be listed).  See 21 C.F.R. §807.22(b).

From November 2014 through the present, the surgical gowns manufactured and sold by Defendant Halyard Health are manufactured at Defendant Halyard Health's unregistered facility in LaGrange, Georgia. Stated differently, the manufacturing mill used by Defendant Halyard Health to

manufacture surgical gowns, is not and has not been registered at all material times with the FDA.

165.   From 2009 to the present, Defendants Kimberly Clark and Halyard failed to make the required 510(k) premarket notifications to the FDA.

166.    Further, from 2009 to the present, Defendants also failed to list those medical devices where changes to the device's intended use or basic function were made in their annual form FDA-2892 submissions to the Government.

167.   An example of the Defendants' failure to submit 510(k) notifications to the FDA is the changes made to feeding tubes Kimberly Clark manufactures that are critical to supporting life and are paid for by Medicare and federal programs.

168.   On November 2, 2007, Kimberly-Clark sent product changes to suppliers for endotracheal tubes that changed the basic function and/or intended use of the endotracheal tubes. Kimberly-Clark did not file new 510(k)s with the FDA for the changes to these devices and from approximately 2007 to 2012, upon information and belief, Kimberly Clark and Halyard have continued these practices of changing products as demonstrated in Exhibits B and C without submitting a 510K to manufacture

and sale said products to the Government and the public.

169.   Further, from 2007 to 2012 the Defendants Kimberly-Clark, Halyard as the successor manufacture of the feeding tubes and endotracheal tubes listed in Exhibit B and C, have failed to submit a separate form FDA-2892 for said endotracheal tubes in their bi-annual listings with the Government.

170.   Form FDA-2892 expressly states that the submission of any report that is false or misleading is a violation of federal law that subjects the violator to punishment of imprisonment, criminal fines, or both. (See Exhibit A, Sample Form FDA-2892).

171.   In addition to the aforementioned endotracheal tubes, from at least 2009 to 2012, Defendants Kimberly Clark, and  Halyard as the successor manufacture of the feeding tubes and endotracheal tubes listed in Exhibit B and C, have failed to file a 510K prior to placing these products in the market and/or changed the basic function and/or intended use of numerous medical devices without submitting 510(k)s for those devices or submitting a separate form FDA-2892 for said devices in their bi-annual listings with the Government.  (See Exhibit B, email from manager includes an Excel document that demonstrates Defendants willfully changed FDA regulated products and this said document acknowledges these said products are

regulated by FDA. In addition, the manager who sent this email made comments within this excel document. See Exhibit C, a Spreadsheet of Defendants' Medical Devices for which 510(k) Premarket Notifications should have been submitted to the FDA but were not.).[1]

172.   On October 26, 2002 the Medical Device User Fee and Modernization Act of 2002 (MDUFA) was signed into law.   The law authorizes the FDA to charge a fee for medical device product reviews. These fees apply to, among other things, PMAs and 510(k) Premarket Notifications.   Further, the MDUFA provides a definite and clear obligation to pay said fees.

173.   Under the MDUFA, the fees must be paid for PMAs and 510(k) Premarket Notifications and the payment of the fees must be received on or before the time the respective application is submitted.   If the PMA or 510(k) applicant has not paid all fees owed, the FDA will consider the application incomplete and will not accept it for filing.

174.   Again, a definite and clear obligation to pay proscribed fees is

---

[1] The Relator's job responsibilities related to product performance attributes caused him to be aware that the Defendants frequently changed and/or continually enhanced many of the medical devices which this document demonstrates in Exhibit B and followed by a list of products the Relator found in Exhibit C. Further, upon information and belief, these changes would also have warranted 510(k) submissions but no 510(k)s were submitted by the Defendant to the Government.  Exhibit B is a sample of the medical devices that (1) Relator is aware of, and (2) a sample wherein the Relator contends some devices entered the market without a 510K submission to the FDA and others had changes made to the basic function and/or intended use of the device without any accompanying 510(k) submission.

required by the MDUFA.

175.    The current MDUFA fee for 510(k) Premarket Notifications is $5,228.00 and the current MDUFA fee for PMAs is $261,388.00.

176.    Each time Defendants failed to submit a 510(k) notification for each change made to the basic function and/or intended use of a device, the Defendants deprived the federal Government of revenue of $5,228.00 per 510(k) notification that was omitted.  Likewise, for each change to a medical device that would necessitate a PMA but no PMA was submitted, the Defendants deprived the federal Government of revenue of $261,388.00 per PMA omitted. In addition, every new device that lacks a necessary 510(k) is considered by operation of law to be a Class III device that needs a PMA, and therefore until that device has a 510(k), it is also adulterated. See FDCA §§ 513(f)(1), 501(f)(1)(B)(i), 21 U.S.C. §§ 360c(f)(1), 351(f)(1)(B)(i). As a result, the Defendants deprive the Government of revenue of $261,388.00 per necessary 510(k) / PMA omitted.

177.    Based upon information and belief of the Relator, the fraudulent practice described above was an ongoing practice by the Defendants from at least 2009 to the present.

178.    The Defendants' practice of routinely failing to file 510(k) Premarket Notifications or PMAs threatens the integrity of the FDA's process

and procedures for medical device reviews and could potentially cause serious harm or death to U.S. citizens and individuals worldwide who use Defendants' products.

179.   As of November 17, 2014 Kimberly Clark's intentional violations or careless disregard of FDA regulations associated with feeding tubes have malfunctioned 314 times causing 182 injuries, and 20 deaths.

180.   With respect to the allegations above, the Defendants acted knowingly to avoid payment of a fee legitimately due to the Government, resulting in actual damages.  The False Claims Act allows for trebling of the actual damages. Further, the Act also specifically provides for payment of reimbursable attorneys' fees and costs expended in the prosecution of this action.

181.   With each form FDA-2892 registration, the Defendants expressly and/or impliedly certifies to the Government that the manufacturer or distributor is in compliance with all FDA regulations and/or federal law pertaining to medical devices.  Kimberly-Clark and Halyard Health have violated FDA regulations and have therefore made false certifications pertaining to the medical devices that they manufacture.

182.   On May 25, 2010, the Conway facility changed the Kotex Security Tampon specification to increase the absorbent capacity of the

tampon.

183.   At all material times hereto, Defendant Kimberly Clark has changed the basic function and/or intended use of a tampon product without submitting 510(k)s for this device or submitting a separate form FDA-2892 for said device in their bi-annual listings with the Government.

184.   With each form FDA-2892 registration, the Defendants expressly and/or impliedly certified to the Government that the manufacturer or distributor is in compliance with all FDA regulations and/or federal law pertaining to medical devices.   Kimberly-Clark and Halyard Health have violated FDA regulations and have therefore made false certifications pertaining to the medical devices that they manufacture.

185.   As noted above, the MDUFA authorizes the FDA to charge a fee for medical device product reviews.   These fees apply to, among other things, PMAs and 510(k) Premarket Notifications.  Further, the MDUFA provides a definite and clear obligation to pay said fees.

186.   Under the MDUFA, the fees must be paid for PMAs and 510(k) Premarket Notifications and the payment of the fees must be received on or before the time the respective application is submitted.  If the PMA or 510(k) applicant has not paid all fees owed, the FDA will consider the application incomplete and will not accept it for filing.

187.   As previously noted, a definite and clear obligation to pay proscribed fees is required by the MDUFA.

188.   The current MDUFA fee for 510(k) Premarket Notifications is $5,228.00 and the current MDUFA fee for PMAs is $261,388.00.

189.   Consequently, like the endotracheal tubes and feeding tubes discussed above, each time Kimberly Clark failed to submit a 510(k) notification for each change made to the basic function (and/or intended use) of its tampon products, Kimberly Clark deprived the federal Government of revenue of $5,228.00 per 510(k) notification that was omitted. As a result, every new device that lacks a necessary 510(k) is considered by operation of law to be a Class III device that needs a PMA, and therefore until that device has a 510(k), it is also adulterated. See FDCA §§ 513(f)(1), 501(f)(1)(B)(i), 21 U.S.C. §§ 360c(f)(1), 351(f)(1)(B)(i). The Defendants then deprive the Government of revenue of $261,388.00 per PMA omitted.

190.   With respect to the allegations above, the Defendants acted knowingly to avoid payment of a fee legitimately due to the Government, resulting in actual damages.  The False Claims Act allows for trebling of the actual damages. Further, the Act also specifically provides for payment of reimbursable attorneys' fees and costs expended in the prosecution of this action.

191.    The Relator has original knowledge that Kimberly-Clark has intentionally violated several FDA regulations, environmental laws, and the Federal False Claims Act by fraudulently making untrue representations about the safety and efficacy of the products they are selling to the public and the United States Government. These fraudulent representations include selling over what is estimated to be at least $1 Billion in misbranded and adulterated products that are dangerous and violate FDA regulations to the United States Government.

192.    During all times relevant to this action, Kimberly-Clark and Halyard knowingly and intentionally:

    i. Made false certifications (factually false certifications and/or implied false certification) that they were:

    • Complying with the FDA's requirement (pursuant to form FDA-2892) to list each medical device where changes to the device's intended use or basic function were made (e.g. devices for which 510(k) notifications should have been submitted to the FDA must be listed);

    • Complying with the FDA's requirement that manufacturers (both domestic and foreign) and initial distributors (importers) of medical devices and

manufacturers of drugs register their establishments and their devices with the FDA, which are done and verified annually in June and December of each year;

- Selling and distributing devices pursuant to their respective federal government contracts that were not adulterated and misbranded;

ii. Made false certifications to the federal government (i.e. the FDA) during the annual registration of its facilities that Kimberly-Clark and Halyard were complying with FDA Regulations including, but not limited to, FDA regulations referenced above in above.

iii. Had the Government been aware that Kimberly-Clark and Halyard were not complying with FDA Regulations it would not have paid Kimberly-Clark and Halyard.

193.   During all times relevant to this case, Kimberly-Clark and Halyard knowingly and intentionally:

i. Submitted claims to the Government that were false, fraudulent and that failed to adhere to the terms and conditions of Kimberly-Clark and Halyard Health's respective contracts with the Federal Government.

ii. Concealed from the Government that they submitted false and fraudulent claims and /or were not complying with the terms and conditions of their respective contracts with the Federal Government.

iii. Had the Government been aware that Kimberly-Clark and Halyard were submitting false and fraudulent claims and /or were not complying with the terms and conditions of their respective contracts with the Federal Government it would not have paid Kimberly-Clark and Halyard.

194.   During all times relevant to this case, Kimberly-Clark and Halyard knowingly and intentionally:

i. Caused false or fraudulent claims to be submitted to the Government by others for payment.

ii. Concealed from the Government that they caused others to submit false and fraudulent claims and /or were not complying with the terms and conditions of their respective contracts with the Federal Government.

iii.     Had the Government been aware that Kimberly-Clark and Halyard were submitting false and fraudulent claims it would not have paid Kimberly-Clark and Halyard.

## COUNT I
### (False Record or Statement Material to an Obligation to Pay)
### 31 U.S.C. § 3729(a)(1)(G) (2009)

195.     Relator realleges all prior paragraphs of the Complaint as if set forth fully herein.

196.     The False Claims Act provides, in pertinent part, as follows: "Any person who . . . knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government is liable to the United States Government . . ."

197.     From at least 2009 to the present, each form FDA-2892 registration submitted by the Defendants to the Government contained misleading and untrue information, fraudulent omissions and concealments regarding the devices and/or products listed.

198.     By failing to submit a 510(k) notification for each product that requires a 510K along with not submitting a 510K for changes made to the basic function and/or intended use of a device, and by failing to separately list on the form FDA-2892 the devices or products whose basic function and/or intended use had been changed, the Defendants deprived the federal Government of revenue of $5,228.00 per 510(k) notification that was omitted.

As a result of not filing a 510K for every new device that lacks a necessary 510(k) is considered by operation of law to be a Class III device that needs a PMA, and therefore until that device has a 510(k), it is also adulterated. See FDCA §§ 513(f)(1), 501(f)(1)(B)(i), 21 U.S.C. §§ 360c(f)(1), 351(f)(1)(B)(i). Consequently, for each new product that did not have a predicated equivalent to it, a PMA was necessary, but no PMA was submitted.  Thus, the Defendants deprived the federal Government of revenue of $261,388.00 per necessary 510(k) / PMA omitted.

199.   With respect to the allegations above, the Defendants acted knowingly to avoid payment of a fee legitimately due to the Government, resulting in actual damages.  The False Claims Act allows for trebling of the actual damages. Further, the Act also specifically provides for payment of reimbursable attorneys' fees and costs expended in the prosecution of this action.

200.   Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled treble damages under False Claims Act, plus penalties of not less than $5,500 and up to $11,000 for each violation.

WHEREFORE, the Relator, on behalf of himself and the United Sates Government, prays:

(a)   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(b)   That the Relator be awarded all costs incurred, including reasonable attorney's fees;

(c)   That in the event that the United States Government proceeds with this action, the Relator be awarded an amount for bringing this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claims;

(d)   That in the event that the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or

settlement;

(e)     That the Relator be awarded prejudgment interest;

(f)     That a trial by jury be held on all issues;

(g)     That the United States Government and the Relator receive all, both at law and at equity, to which they may reasonably be entitled.

## <u>COUNT II</u>
### (False or Fraudulent Claims)

**31 U.S.C. § 3729(a)(1)(A) (2009) formerly 31 U.S.C. §3729(a)(1) (2006)**

201.   Relator realleges all prior paragraphs of the Complaint as if set forth fully herein.

202.   A factually false claim occurs when a claimant misrepresents what goods or services that it provided to the Government.

203.   A claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition of payment.

204.   Consequently, the False Claims Act may be based on factually false and legally false claims.

205.   Defendants Kimberly-Clark and Halyard knowingly presented, or caused to be presented, directly or vis-à-vis, false certifications, false or fraudulent claims for payment or approval. 31 U.S.C. § 3729(a)(1)(A) (2009).

206.    Defendants Kimberly-Clark and Halyard knowingly presented, or caused to be presented, directly or vis-à-vis, false certifications, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval. 31 U.S.C. §3729(a)(1) (2006).

207.    Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled treble damages under False Claims Act, plus penalties of not less than $5,500 and up to $11,000 for each violation.

WHEREFORE, the Relator, on behalf of himself and the United Sates Government, prays:

(a)    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(b)    That the Relator be awarded all costs incurred, including reasonable attorney's fees;

(c)    That in the event that the United States Government proceeds with this action, the Relator be awarded an amount for bringing this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claims;

(d)    That in the event that the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement;

(e)    That the Relator be awarded prejudgment interest;

(f)    That a trial by jury be held on all issues;

(g)    That the United States Government and the Relator receive all, both at law and at equity, to which they may reasonably be entitled.

## COUNT III
### (False Statements)

**31 U.S.C. 3729(a)(1)(B)(2009), formerly 31 U.S.C. §3729 (a)(2) (2006)**

208.    Relator realleges all prior paragraphs of the Complaint as if set forth fully herein.

209.   Defendants Kimberly-Clark and Halyard knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(A) (2009).

210.   Defendants Kimberly-Clark and Halyard knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  31 U.S.C. §3729(a)(2) (2006).

211.   Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled treble damages under False Claims Act, plus penalties of not less than $5,500 and up to $11,000 for each violation.

WHEREFORE, the Relator, on behalf of himself and the United Sates Government, prays:

> (a)   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related

to this action;

(b)     That the Relator be awarded all costs incurred, including reasonable attorney's fees;

(c)     That in the event that the United States Government proceeds with this action, the Relator be awarded an amount for bringing this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement of the claims;

(d)     That in the event that the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement;

(e)     That the Relator be awarded prejudgment interest;

(f)     That a trial by jury be held on all issues;

(g)     That the United States Government and the Relator receive all, both at law and at equity, to which they may reasonably be entitled.

*/s/ Larry A. Golston, Jr*
Larry A. Golston, Jr.
Attorney for Relator

OF COUNSEL:
**BEASLEY, ALLEN, CROW, METHVIN,**
**PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax:   (334) 954-7555

Christopher D. Glover (GA Bar No. 417058)
**BEASLEY, ALLEN, CROW, METHVIN,**
**PORTIS & MILES, P.C.**
4200 Northside Parkway
Building One, Suite 200
Atlanta, GA 30327
Phone: (404) 751-1162
Fax: (855) 674-1818
Email: christopher.glover@beasleyallen.com
*Attorney for Relator*

Jason S. Coomer
**LAW OFFICES OF JASON S. COOMER, PLLC**
406 Sterzing, Second Floor
Austin, Texas 78704
Phone: (512) 474-1477
Fax: (512) 474-1802
Email: jsc@texaslawyers.com
*(admitted Pro Hac Vice)*
*Attorney for Relator*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in local rule 5.1(C) and 7.1(D).  This the 21st day of August, 2017.

*s/ Larry A. Golston, Jr.* _____
LARRY A. GOLSTON, JR.
*Attorney for Relator*


## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August, 2017, I have served a true and correct copy of  Motion for Leave to Amend Complaint by filing the same using the Court's EFC system, which will automatically send a notification to the flowing attorneys of record:

David A. O'Neal
Assistant United States Attorney
U.S. Attorney's Office - ATL
600 U.S. Courthouse
75 Ted Turner Drive, SW, Suite 600
Atlanta, Georgia 30303
Phone: (404) 581-6224
Fax: (404) 581-6181
Email: david.oneal@usdoj.gov
*Attorney for the United States of America*

Joe D. Whitley
Brett A. Switzer
**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**
3414 Peachtree Road N.E.
Monarch Plaza, Suite 1600
Atlanta, GA 30326
Phone: (404) 223-2209
Fax: (404) 238-9799
Email: jwhitley@bakerdonelson.com
Email: bswitzer@bakerdonelson.com
*Attorneys for Defendant Kimberly Clark*

James M. Cole
Brenna E. Jenny
Kristin G. Koehler
Joshua Fougere
**Sidley Austin, LLP**

1501 K Street NW
Washington,DC 20005
Phone: (202) 736-8000
Fax: (202) 736-8711
Email:  jcole@sidley.com
       bjenny@sidley.com
       kkoehler@sidley.com
       jfougere@sidley.com
*(admitted pro hac vice)*
*Attorneys for Defendant Kimberly Clark*

Scott D. Stein
**Sidley Austin, LLP**
One South Dearborn
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036
Email:  sstein@sidley.com
(*admitted pro hac vice*)
*Attorney for Defendant Kimberly Clark*

William R. Mitchelson, Jr.
Meredith Jones Kingsley
**Alston & Bird, LLP**
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
Phone: (404) 881-7000
Fax: (404) 881-7777
Email: meredith.kingsley@alston.com
*Attorneys for Halyard Health, Inc.*

                   *s/ Larry A. Golston, Jr.*
                   OF COUNSEL